*Andersons v. Great Bay Solar, LLC, et al.*, No. 2387, September Term, 2018.  Opinion by Graeff, J.


**PROPERTY — OWNERSHIP — PUBLIC HIGHWAYS**

In the case of an ordinary highway, the general rule is that, absent evidence to the contrary, the public acquires only an easement of passage, and the adjacent landowner, subject to this easement, owns the land below the surface of the road.  When a municipality acquires an easement of passage on a public street, however, it acquires the right to improve and maintain the road.  Additionally, when land abutting a road is transferred, there is a presumption that title to the center of a binding street passes to the grantee under both common law and Md. Code (2015 Repl. Vol.) § 2-114(a) of the Real Property Article ("RP").  Absent evidence to the contrary, the Andersons' evidence of their ownership of the farms established they own the land under the roads in fee simple, and the circuit court should issue a declaratory judgment in that regard.

**PROPERTY — EASEMENT**

An easement holder generally cannot use the land for any purpose other than that contemplated by the grant, although the scope of the easement may account for evolving uses consistent with the easement's original purpose.  Because the circuit court did not state the basis for its finding that the County had a "sufficient interest" to grant GBS the right to install the collections systems in the roads, and because factual findings are required to resolve this issue, the case must be remanded to the circuit court for clarification regarding this issue.

**EQUITY — LACHES**

Laches precludes equitable relief when there is an unreasonable delay in the assertion of rights, and that delay results in prejudice to the opposing party.  A relatively short period of time may be found to constitute an unreasonable delay under the circumstances of the case.  When a party knows that construction is scheduled to occur, they must diligently protest their rights, and waiting until the defendant incurs significant costs before filing suit may result in the claim being barred by laches.  In this case, the court properly denied the Andersons' request that the court order GBS to remove the cables and restore the roads to their previous condition.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2387

September Term, 2018

_____

WILLIAM H. ANDERSON
and
H. KEVIN ANDERSON

v.

GREAT BAY SOLAR I, LLC
and
BOARD OF COMMISSIONERS OF
SOMERSET COUNTY

_____

Graeff,
Nazarian,
Arthur,

JJ.

_____

Opinion by Graeff, J.

_____
_____

Filed:  December 18, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant, William Anderson, is the owner of two agricultural properties in Somerset County. He is the sole owner of the Ira Barnes Farm, and he co-owns the Ben Barnes Farm with his son, Kevin Anderson, also an appellant. The farms abut, or are bisected by, Dublin Road and Old Princess Anne Road. On June 29, 2015, Somerset County entered into an Easement Agreement with Great Bay Solar I, LLC ("GBS"), appellee, to allow GBS to install collection systems along or below certain county roads, including Dublin Road and Old Princess Anne Road, to transport the power from their solar panels to the general electric grid.[1]

In April 2017, GBS began laying cable under these roads in accordance with the Easement Agreement. The Andersons objected to the project, and on July 5, 2017, they filed in the Circuit Court for Somerset County a complaint against GBS, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction to halt the project. The Andersons alleged that they had fee simple ownership of the roadbeds where GBS was burying the collection systems, and therefore, GBS was trespassing.

On September 8, 2017, the Andersons filed an amended complaint. They added as a defendant the Board of County Commissioners of Somerset County (the "County"), appellee, and added a request for a declaratory judgment that they owned in fee simple the

---

[1] GBS states in its brief that its solar facility in Somerset County

"harvests" solar energy, which then must be converted to markable electricity at an offsite substation. The solar energy is conveyed to the substation via underground transmission cables ("collection systems") from five solar "farms" in the area near Appellants' property. Great Bay is engaged in the business of producing and selling the electricity generated by the solar facilities into the electrical grid.

land beneath Old Princess Anne Road and Dublin Road where the roads abutted or bisected their property and that GBS's installation of high voltage electric cable constituted an unlawful trespass on their property. They also sought an order directing GBS to remove all electric cable from beneath the roadbeds.

On October 27, 2017, GBS filed a Counterclaim for Declaratory Judgment. It requested a declaratory judgment that: (1) the County owned the roadbeds under the roads at issue; (2) alternatively, that the County possessed a sufficient interest in the roads to support the grant to GBS of rights to install the collection systems; or (3) alternatively, that the Andersons were precluded from equitable relief based on the doctrines of waiver, estoppel, and laches.

On August 30, 2018, after a three-day bench trial, the circuit court issued a written "Opinion and Declaratory Judgment." It ruled that neither the Andersons nor the County met their burden of proof that they had a fee simple interest in the roads, that the County possessed sufficient interest in the roads to grant GBS the right to install the collection systems, that GBS had the legal right to install them, and that the Andersons were barred "from any equitable relief they seek based on the doctrines of waiver, estoppel, and laches."

On appeal, the Andersons present the following questions for this Court's review, which we have consolidated and rephrased slightly, as follows:

1.  Did the circuit court err in finding that the Andersons did not present sufficient evidence to support their claim that they have a fee simple interest in the land lying beneath the portion of Dublin Road running through and bisecting the Ira Barnes Farm and beneath the portions of Dublin Road and Old Princess Anne Road bisecting and abutting the Ben Barnes Farm?

2

2.  Did the circuit court err in concluding that, even though Somerset County does not have a fee simple interest in the roads, it nonetheless possesses a "sufficient interest" to permit it to grant GBS the right to utilize the land beneath the roadbeds for the installation of its industrial-scale, electrical cables?

3.  Did the circuit court err in concluding that the doctrines of waiver, estoppel and laches barred the Andersons' claims for equitable relief, and if not, are their claims for a legal remedy also barred?

On cross-appeal, GBS and the County raised the following additional question:

Did the circuit court err in holding that the County failed to prove that it owned Dublin Road and Old Princess Anne Road in fee simple?

For the reasons set forth below, we shall affirm, in part, and reverse, in part, the judgment of the circuit court and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.

### The Solar Project

Appellants, William Anderson and Kevin Anderson, have lived and worked as farmers in Somerset County all their lives. William Anderson owns both the Ira Barnes Farm and the Ben Barnes Farm, the latter of which he co-owns with his son, Kevin Anderson. The Andersons use these farms to grow barley, wheat, corn, and soybeans. The farms are located approximately two miles south of the town of Princess Anne, outside the reach of municipal utilities such as water, sewer, or cable lines.

This appeal relates to the roads that bisect and border these two farms. Dublin Road runs east-west and bisects both farms across their northern portions. Old Princess Anne Road is perpendicular to Dublin Road, running north-south, and it establishes the western

border of the Ben Barnes Farm. Dublin Road terminates at Old Princess Anne Road at the northwest border of the Ben Barnes Farm.[2]

In 2014, before obtaining an easement from the County to install the collection system under the roads, representatives from Pioneer Green, the former parent corporation of GBS, approached the Andersons about leasing or buying a portion of their farmland as a site for a wind project.[3] The Andersons refused to sell or lease their farms. The company subsequently proposed leasing a right-of-way to place a collection system through the property, and they reached a verbal agreement to a "40 foot right-of-way adjoining Dublin Road." When the company drew up the paperwork, however, the terms of the agreement had been changed, without notice, to a 50-foot right-of-way for no additional compensation. The Andersons advised that they were not interested "in doing business with dishonest people." That ended GBS's attempt to lease land from the Andersons.

Kevin Anderson testified that, in June or July 2015, during a meeting on another issue, GBS informed him that it did not need the right-of-way from him anymore because the County had granted them permission to "run their cables down [the County's] right-of-way." Kevin Anderson replied: "I don't believe the [C]ounty can give you the authority to do what you're trying to do, I think you need the landowner's permission." Although Kevin Anderson testified that GBS did not say specifically what the plans were, he testified

---

[2] Arden Station Road initially was included in GBS's collection system plans, but this plan was dropped.

[3] The project initially was planned as a wind project, but the plan subsequently switched to a solar project.

that, in February or March of 2015, he saw GBS surveying roads in the area, particularly Dublin Road and Arden Station Road. He testified that this was the first time that he became "aware that they were contemplating burying cables in these roads."

In February 2015, Kevin Anderson met with Woody Barnes, head of the County Roads Department, regarding the surveying. Kevin Anderson stated his belief that he owned the section of Dublin Road that bisected his property, and the County merely had a right-of-way to maintain a public road. Mr. Barnes said that he understood Mr. Anderson's concern, but he worked for the County, and his "job was to facilitate this venture, not obstruct it."[4]

On June 29, 2015, GBS entered into an agreement (the "Easement Agreement") with the County that allowed GBS to lay collection systems under various county roads, including Dublin Road and Old Princess Anne Road. The Easement Agreement authorized GBS to

> access and utilize County roadways, install facilities in, through, along, over or under, and make necessary improvements to, County right-of-way and other real property in order to transport equipment used in electric generation facilities and transmit electricity and electrical connection services through Public Ways of the County[.]

"Public Way" is defined in the agreement as "the surface of, and the space above and below, any public right-of-way . . . now or hereafter held in fee simple title or any other

---

[4] Mr. Barnes testified that he first learned of Kevin Anderson's concern in February 2016, at which time they discussed the County's intent to enter an agreement with GBS to run transmission lines down the roads, including Old Princess Anne Road and Dublin Road. Given the timing of the County's ultimate agreement in June 2015, the meeting most likely was in 2015.

lesser or conditional estate, grant or leasehold interest by the County in those certain rights-of-way" as identified on an attached map showing the roads and properties pertinent to this appeal. The Easement Agreement was recorded in the land records for Somerset County in Liber 0904, folio 0461.

The GBS project was discussed at multiple meetings of the Somerset County Planning and Zoning Commission (the "Commission"). The Planning Commission was responsible for reviewing the solar project and approving the site plans for each of the sites where solar panels were proposed. Kevin Anderson, a Commission member since 2013, and Vice Chairman since 2016, testified that the role of the Planning Commission is to prepare recommendations for the County Commissioners' approval, not to "have the final say on whether [an action] is approved or rejected."

Kevin Anderson was present for all but one of the meetings during which the GBS project was discussed. In a meeting in 2014, Jim Porter, the Commission's attorney, stated that, based on his research in the context of setbacks for the project in its early stages, he determined that most county roads in Maryland were rights-of-way, not property owned by the County.

At a meeting held on May 7, 2015, Gary Pusey, the Somerset County Planning Director, informed the Commission that GBS was pursuing a solar project, as opposed to the initial wind turbine project. The power generated would be used "entirely off-site."

On September 3, 2015, Mr. Pusey provided the update that the project was being reviewed by the Public Service Commission. He gave Commission members a map showing "what sites were possibly being considered."

6

At the January 7, 2016, meeting, Mr. Pusey informed members that the project had received approval by the Public Service Commission, with the condition that the Planning Commission give site plan approval. He advised that there had been a roads agreement with the County. Mr. Pusey stated that the Planning Commission would review the plans "for zoning issues, setbacks, buffering issues, and so on."

The minutes reflect that Kevin Anderson was not present for this meeting. He testified, however, that he talked to Mr. Pusey at the January meeting about his concern regarding "the roads issue" and the site plans. He stated that Mr. Pusey responded that the Planning Commission was responsible only for the site plans, which "would not contain anything to do with the roads," which would be handled by the Roads Board.

On February 4, 2016, Mr. Pusey informed the Commission that plans for the five solar sites and a substation were under review by planning staff and would be presented to the Planning Commission at the next meeting. Kevin Anderson wanted to ensure that the County addressed drainage. The minutes reflect that "Mr. Anderson stated concerns of setbacks from roads and ensuring proper maintenance of the ditches."

Also in February 2016, Kevin Anderson met again with Woody Barnes, who told him that GBS would be laying the collection system "down the center of the road[s]" pursuant to the Easement Agreement. Mr. Anderson testified, however, that Mr. Barnes did not specify the roads to which he was referring.

7

At the March 3, 2016, meeting, approval of the site plan for GBS's solar project was a central topic of discussion.[5]  Mr. Anderson understood that GBS was waiting for the County's permission "to go ahead with the site plans."  The locations for the solar farms were discussed, but Mr. Anderson testified that the site plans introduced at the meeting did not include any reference or depiction of the collection systems that were going to transfer the electricity generated on the sites to the substation.  Mr. Pusey testified that, prior to the approval of the site plans, there was a statement that the transmission lines would be located in the roads, including Old Princess Anne Road and Dublin Road.  Mr. Anderson testified that, in response to this comment, he stated that he wanted to hear more about this, but he was advised that it did not impact the site plan, and the Commission had no "say over it."  The minutes reflect that Mr. Anderson made several comments, but he ultimately voted to approve the proposed site plans.[6]

Following this meeting, Mr. Anderson began having conversations with County officials more involved with the Roads Department.  He met with Charles Fisher, a County Commissioner, and explained his view that he held title to the property, the County had only a right-of-way through the roads for a public way, and he did not "think the [C]ounty

---

[5] The minutes refer to the project as the "Algonquin Solar Project."  Algonquin Power was the parent company of GBS at the time of this meeting, having acquired it from Pioneer Green in August 2015.

[6] David Philpott, Senior Product Manager with Algonquin Power, testified that it was "well known" to members of the Planning Commission since March 2016 that collection lines would be installed underneath the roadbeds of Dublin Road and Old Princess Anne Road.

had the ability to transfer their right-of-way to another private entity." Mr. Fisher told Mr. Anderson that, although the County owned the roads and could do anything they wanted with them, Mr. Anderson should not worry about the solar project because there were problems with concrete under the road, and the project was a "dying issue" that "wasn't coming." Moreover, Mr. Fisher informed Mr. Anderson that the economic viability of the project was being reviewed because the value of Emission Reduction Credits had dropped.[7] After Mr. Anderson was told that the project probably would not go forward, and he witnessed no further activity on the roads in the ensuing months, Mr. Anderson "dropped [his] guard down" and ceased to be actively concerned.

Mr. Anderson also met with Rex Simpkins, another County Commissioner. Mr. Simpkins stated that the County was confident that it owned the roads and that the Andersons' claims had no merit. Mr. Anderson testified that, during these discussions, he never saw any documentation regarding exactly how or where the collection systems were going to run.

GBS, meanwhile, was working on its plan. It obtained zoning certificates and building permits in February 2017.

On March 29, 2017, and April 5, 2017, the local newspaper posted a temporary road closure notice, stating that "construction and feeder routes to the solar farms of [GBS]" would begin on April 17, 2017, and it named Old Princess Anne Road and Dublin Road as

---

[7] The Emission Reduction Credit Program is an environmental credit program used to as an incentive to reduce air pollutants in accordance with the Clean Air Act. Melissa Hearne, *Pulling Profit from Air*, 35 Md. B. J. 22, 23 (2002).

affected areas.  Kevin Anderson testified that he saw this notice in the paper.  Also on March 29, 2017, the Andersons received a form letter from Algonquin Power advising them that the company had been authorized "to begin work within the County Right of Way for the completion of the Great Bay Solar I Project[,]" and that work would begin the week of April 3, 2017.  Construction began on the project on April 19, 2017.[8]

Kevin Anderson testified that he was "aware that they were contemplating burying cables in the roads" when he saw GBS surveying Dublin Road and Arden Station Road in Spring 2015. He first learned that the cables were going to be buried in Dublin Road and Old Princess Anne Road from the public notice. The following colloquy then ensued about his knowledge of the plan:

> [Mr. Anderson]: The public notice that was in the paper didn't tell us where and how, it just told us that these roads would be closed for installation of cable. I mean I never knew that they were going – I never knew that they were going down the road excavating out a trench and backfilling it with concrete until they started the work.
>
> [Counsel for the Andersons]: Well, you must have had some awareness or some idea that they were going to be doing this on Dublin Road and Old Princess Anne Road bordering your farms when you went to see the commissioners and county attorney?
>
> [Mr. Anderson]: I knew that it was proposed and it was a possibility but, for instance, Arden Station Road had been in the project, had been surveyed and been a part of all of this investigation but Arden Station Road was never used. And the description from what they had signed with the county, they had multiple roads listed. I mean they had more roads listed than they used. So it was very vague, you know, and nobody ever came – nobody ever came to us

---

[8] Kevin Anderson testified that the collection system was buried under the westbound lane of Dublin Road and the northbound lane of Old Princess Anne Road to maintain traffic flow during construction.  The northbound lane of Old Princess Anne is the side of the road abutting the Ben Barnes Farm.

10

offering to give us information, even though I was certainly asking for it. I did not actually know the plan for Dublin Road until the construction people got there and started putting up the signs and I asked them. I didn't know if they were going to trench it down the side of the road like they bury existing electrical cable. Delmarva Power usually doesn't dig up the road or excavate material out, they use something called a plow and plow it in. And I didn't know what technique they were going to use.

After receiving the notice, Mr. Anderson went to the GBS work site construction trailer to advise that he had a problem with the project, and they were trespassing on his property.

In April 2017, the Andersons retained legal counsel, who drafted a letter to GBS stating the Andersons' objections. Lacking the requisite contact information for the contractors working on the project to copy them on the letter, counsel asked Mr. Anderson to return to the work site trailer to inquire about this information. On this second visit to the trailer on May 11, 2017, Mr. Anderson spoke with a handful of contractors, and for the first time, he saw the official plans for the installation of the cable under Dublin Road. Mr. Anderson reiterated his position that his property rights were being infringed upon, and he requested that the contractors stop immediately. One of the contractors testified that Mr. Anderson stated during this visit that he had no legal right to Old Princess Anne Road because it used to be a state highway, but he argued that Dublin Road was his property.

David Philpott, Senior Project Manager for Algonquin Power, and GBS's expert witness, testified that they began installing cables on Old Princess Anne on approximately April 19, 2017. On May 17, 2017, GBS received a cease and desist letter from an attorney

11

for the Andersons.[9]  On May 24, 2017, GBS's attorneys replied, stating that GBS had been granted easement rights from the County, the owner of the public road.  The letter asserted many of the claims raised here, and it requested copies of any documents showing that the Andersons owned the property.  Additional correspondence ensued.[10]

On July 5, 2017, failing to resolve the issue out of court, the Andersons filed a complaint.  Kevin Anderson testified that the reason for the delay between the final letter on June 16 and the initial complaint on July 5 was because they were waiting on a search of the deeds and tracking down proper titles.  GBS asserts that, by the time the complaint was filed, it had completed 90–95% of the work installing collection systems along Dublin Road and Old Princess Anne Road.[11]  Mr. Philpott testified that the cost of installation under these roads was nine to ten million dollars, and it would cost approximately two million dollars to remove the cables.

---

[9] Kevin Anderson testified that he retained counsel in reaction to the public notice and form letter on March 29, 2017.  The delay in action between the March 29 notice and the May 17 letter was due to his dissatisfaction with his previous attorney's response to the matter, which forced him to shop around for a new local attorney, many of whom had conflicts with the County.

[10] The Andersons' attorney responded via e-mail on June 5, 2017, re-stating their claim that the County did not have the authority to grant the easement.  GBS's attorney stated at trial that he never received this e-mail from the Andersons' attorney because it was sent to the wrong address.  On June 16, 2017, GBS's attorney sent a "follow up" letter stating that they had not received a response, and please reply.

[11] Cable installation on Old Princess Anne Road began in mid-April and was completed by mid-May; the cable installation then began on Dublin Road.

12

## B.

## Procedural History

In the July 5, 2017, complaint against GBS, the Andersons sought a temporary restraining order and a preliminary and permanent injunction enjoining GBS from trespassing on their land to bury the collection systems beneath the roadbeds and a permanent injunction requiring GBS to remove the collection systems already laid and restore the roadbeds to their preexisting condition.[12] The Andersons stated that, unless GBS was restrained from continuing to place "encased high voltage electric cables" beneath the roads, they would suffer "irreparable injury" because the concrete wall would "severely limit and may even preclude Plaintiffs from being able to run irrigation pipes and public utility companies from being able to run ordinary utility lines under and across the roads to provide needed service," due to "the depth that would be required for such crossings to maintain adequate separation from the high voltage cables." They alleged that granting injunctive relief was in the public interest because it would reduce the amount of work needed to remove the concrete walls and cables, which the Andersons noted would

---

[12] The complaint stated:

> The procedure for the installation of Defendant's cable consists of excavating a trench through the road pavement that is approximately two feet wide and four feet deep, selling or otherwise arranging for the removal of the excavated dirt to or by third parties, laying the cable on the dirt at the bottom of the trench, filling up the trench with concrete so as to be level with the road surface, thereby creating an uninterrupted, underground 2'x4' concrete wall under the road surface.

13

"be more complicated, expensive and time consuming than their installation, the cost of which is impossible to even estimate."

The court held a hearing on August 8, 2017. On September 7, 2017, the court issued an order granting a preliminary injunction. The court noted that, at the time of the hearing, GBS had completed the installation of cable in the portion of the roads at issue on appeal, and the request for an injunction prohibiting further cable installation was moot. The court issued a preliminary injunction restraining GBS from placing new asphalt on the road or installing cable under other portions of Old Princess Anne Road.

The next day, September 8, 2017, the Andersons filed an Amended Complaint for Declaratory Judgment, Injunctive and Other Relief. The amended complaint added the County as a defendant, and it requested a declaratory judgment that the Andersons owned in fee simple the land beneath Old Princess Anne Road and Dublin Road where the roads abut the Andersons' farms and that GBS's cable installation constituted an unlawful trespass on their property. It also sought an order directing GBS to remove the collection systems, refill the trenches, and repave the road surfaces, as well as an order granting the Andersons a permanent injunction restraining GBS from burying electrical cable under the roads.

On October 27, 2017, GBS filed a Counterclaim for Declaratory Judgment, requesting that the court declare that the County either owned the roadbeds or had an interest sufficient to grant GBS the right to install the collection systems. Alternatively, it requested a declaration that the Andersons were "precluded from the equitable relief they seek based on the doctrines of waiver, estoppel and laches."

14

In this regard, GBS alleged that, after providing notice on March 29, and April 5, 2017, the installation of the collector lines would begin, GBS began installing the cables in the roadbed of Old Princess Anne Road "in plain view of" the Andersons, and they completed the work on approximately May 19, 2017. They began installation under Dublin Road on approximately June 19, 2017, and at the time of the filing of the counterclaim, it had completed the installation of 9,750 feet of collector lines.

GBS also alleged that roads have a nominal value of one dollar in the context of condemnation proceedings. As another alternative, GBS requested that the Andersons were entitled to payment of one dollar for GBS's use of the roadbeds.

The circuit court held a three-day bench trial on June 20–22, 2018. On August 30, 2018, the court issued an Opinion and Declaratory Judgment. It included, among other things, the following factual findings:

4. Somerset County has maintained Dublin Road and Old Princess Anne Road for decades. In addition to maintaining the surface of the roads, the County has maintained the subsurface of said roads, including the maintenance of drainage pipes and culverts underneath the roadbeds. These pipes and culverts benefit the farms that Plaintiffs own.

5. In March and April of 2015, Plaintiffs negotiated with Great Bay to lay cable under Plaintiffs' farms, the negotiations failed and, on or about 29 June 2015, Great Bay entered into an Easement Agreement with Somerset County to lay cables under certain County roads.

6. In January 2016, Plaintiffs began surveying Old Princess Anne Road.

7. In February 2016, Plaintiffs learned the County and Great Bay had entered into an Easement Agreement to install the cables under County roads.

8. On 3 March 2016, Plaintiff Kevin Anderson participated in a Planning and Zoning Commission meeting in which cable installation under Old

15

Princess Anne Road, Dublin Road, and Arden Station Road was discussed; he also voted to approve the proposed cable installation.

9. In late 2016, both Plaintiffs informed County Commissioners Charles Fisher and Rex Simpkins that they objected to cable installation under Old Princess Anne Road, Dublin Road, and Arden Station Road, on the theory that they actually own the roads; Mr. Fisher and Mr. Simpkins responded that the County owns the roads, and Mr. Simpkins said, "If you disagree, that's why we have a courthouse."

10. On or about 29 March 2017, Plaintiffs received a form letter from the County informing them that portions of Old Princess Anne Road, Dublin Road, and Arden Station Road would soon be closed to accommodate cable installation; and, at about the same time, Plaintiffs saw a notice to that effect in a local paper.

11. On or about 5 April 2017, Plaintiffs again saw a notice in the local paper warning that the three roads which are the subject of this suit would soon be closed to accommodate cable installation.

12. Shortly thereafter, cable installation began on Old Princess Anne Road, and was completed by early May, when cable installation began on Dublin Road.

13. On or about 16 May 2017, Plaintiff Kevin Anderson entered a trailer serving as a field headquarters for Great Bay work crews installing the cable, informed the workers that he and his father were asserting ownership to Dublin Road, and asked for contact information so he or his attorney could write Great Bay demanding installation stop.

14. On 17 May 2017, [counsel for the Andersons] wrote on behalf of Plaintiffs to Great Bay, asserting that Plaintiffs own Old Princess Anne Road and Dublin Road, or portions of them, and demanding installation stop.

After setting forth these factual findings, the court then stated that it had reached the following "conclusions of law":

a. Neither Plaintiff has met his burden of proof that he has a fee simple ownership interest in either Dublin Road or Old Princess Anne Road;

16

b.   Somerset County has failed to prove that it owns a fee simple interest in said roadbeds whether by patent, deed, adverse possession, eminent domain, dedication, or any other method.

c.   Somerset County is lawfully maintaining the surface of both Dublin Road and Old Princess Anne Road, as well the subsurface culverts, drains, pipes, and gutters used for water run-off; and

d.   By virtue of the finding of fact in paragraphs 4-14 above, Plaintiffs are barred from any equitable relief they seek based on the doctrines of waiver, estoppel, and laches.

The court ultimately ruled that the County "possesses sufficient interest in Dublin Road, and Old Princess Anne Road to grant to Great Bay Solar I, LLC the right to install the collection system in such roadbeds in accordance with the terms of the Easement Agreement," and therefore, GBS had "the legal right to install its collection systems in the roadbeds." Accordingly, the court denied the request for permanent injunction requiring GBS to remove the collection systems and prevent additional installation of the systems.

The Andersons' appeal, and the cross-appeals of GBS and the County, followed.

**STANDARD OF REVIEW**

Md. Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

The Court of Appeals has further described the standard of review under Md. Rule 8–131(c), as follows:

We give due regard to the trial court's role as fact-finder[,] and will not set aside factual findings unless they are clearly erroneous. The appellate court must consider evidence [that is] produced at the trial in a light most favorable

17

to the prevailing party[,] and[,] if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous[,] and cannot be disturbed. Questions of law, however, require our non-deferential review. When the trial court's decision involves an interpretation and application of Maryland statutory and case law, [this] Court must determine whether the trial court's conclusions are legally correct. Where a case involves both issues of fact and questions of law, this Court will apply the appropriate standard to each issue.

*Estate of Zimmerman v. Blatter*, 458 Md. 698, 717–18 (2018) (quoting *Bottini v. Dep't of Fin.*, 450 Md. 177, 187 (2016)).

## DISCUSSION

## I.

## Ownership Interest in the Roadbeds

The Andersons and the County each contend that they have a fee simple interest in Old Princess Anne Road and Dublin Road. They each assert that the circuit court's finding that they failed to show fee simple ownership was erroneous.

The Andersons contend that their expert witness, Christopher Custis, a licensed property line surveyor, traced the Andersons' ownership "back to original land patents granted by the State of Maryland or its predecessor, the Lord Proprietor, and through the fee simple deeds to them."[13] With respect to Dublin Road, which was established after the

_____

[13] "Land patents are the first link in the chain of title of ownership of land in Maryland." *Marquardt v. Papenfuse*, 92 Md. App. 683, 689, *cert. denied*, 328 Md. 93 (1992). In 1632, King Charles I granted Maryland to the Calverts, making Lord Baltimore the Lord Proprietor of Maryland, having the right to grant land to others by means of patents. *Id.* at 689–90. *Accord Maryland Coal & Realty Co. v. Eckhart*, 25 Md. App. 605, 606–09, *cert. denied*, 275 Md. 753 (1975). Article 5 of the Maryland Declaration of Rights confirmed that the "Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by his majesty Charles the First to Caecilius Calvert,

18

patents for the land had been granted, they assert that the evidence presented, as well as the lack of any "recorded deed or other instrument" conveying fee simple title of the road to the County, shows that they own the land on which the road rests, "subject to the County's right-of-way easement."

With respect to Old Princess Anne Road, abutting the Ben Barnes Farm, the Andersons contend that they have fee simple title to the southerly 2,400 feet under which GBS has buried its cable. They assert that "[t]he land under the already existing road was not reserved when the Lord Proprietor granted the Arracoco Neck/Double Purchase patent in 1680 and neither Mr. Custis nor Mr. Simpkins located any subsequently recorded deed or other instrument conveying fee simple title to the County or the State."

The Andersons argue that the roadbeds are included in the property transfers about which Mr. Custis testified because, under Md. Code (2015 Repl. Vol.) § 2-114(a) of the Real Property Article ("RP"), any deed "that grants land binding on any street or highway . . . shall be construed to pass to the devisee, donee, or grantee all the right, title and interest of the devisor, donor, or grantor . . . in the street or highway for that portion on which it binds." They assert that, because the deeds for each farm describe the property as binding to the road, these property transfers include the land under the abutted road.

Appellees contend that the trial court properly concluded that the Andersons failed to meet their burden of proof to establish fee ownership. With respect to the Ben Barnes

---

Baron of Baltimore." *See also Porter v. Schaffer*, 126 Md. App. 237, 245, *cert. denied*, 355 Md. 613 (1999), noting that, "[w]hen the Colony of Maryland became the State of Maryland, the power of the Lord Proprietor to grant land passed to the judges of the Land Office, a position now represented by the Commissioner of Land Patent."

Farm, GBS asserts that there was a 176-year gap in the chain of title. With respect to the Ira Barnes Farm, it asserts that the evidence showed that, in 1947, the State exercised a purchase option for Dublin Road to widen it to accommodate certain utilities. GBS argues that, although no deed was found to give legal title, "the State acquired equitable title to Dublin Road in 1947 when the Purchase Option was executed." With respect to the Andersons' reliance on Md. Code RP § 2-114, GBS contends that the reliance is misguided because it simply contains a presumption for a conveyance when the grantor already has title to the road, but it does not address the issue of ownership.

The County argues that Mr. Custis admitted that the deeds and patents he reviewed did not reference ownership of the roads. It asserts that Mr. Custis' conclusion that, "because he did not find deeds to the County for the roads, the Andersons must own them [is] a leap of faith truly Olympic in dimension." The County argues that, to meet their burden to prove that they owned the roads, the Andersons "had to do more than simply cast doubt upon the County's ownership."

Appellees also contend, in their cross-appeal, that the circuit court erred in concluding that the County did not have fee simple ownership of the roads because the County acquired the roads by adverse possession. They further assert that Mr. Simpkins explained that the roads were "established hundreds of years ago through a process he likened to a 'judicial taking,' or eminent domain proceeding." And, they argue, in 1947, the State purchased options in fee simple to expand Dublin Road, and "[s]ince the options were to purchase land in fee simple, it stands to reason the road being enlarged was itself owned by the State in fee simple."

20

The circuit court found that neither the Andersons nor the County met their burden of proof to show fee simple ownership of the relevant portions of Old Princess Anne Road and Dublin Road. Before analyzing the court's conclusion in that regard, we will discuss the evidence regarding the two farms and the two roads.

## A.

### The Ben Barnes Farm

### 1.

### Evidence Regarding the Farm

The Ben Barnes Farm, totaling approximately 114 acres and depicted on Somerset County Tax Map 0024 as Parcel 0004, is owned jointly by William Anderson and Kevin Anderson as tenants in common. It is located directly to the west of the Ira Barnes Farm. It is the only property owned by Kevin Anderson at issue in this appeal, which involves the portion of Dublin Road that bisects the farm and Old Princess Anne Road, which abuts the western boundary of the farm, running north-south. A body of water called Kings Creek also bisects the wooded area of property, running from the farm's western border, where it crosses under a bridge ("Kings Creek Bridge") on Old Princess Anne Road, to the southeast corner of the farm.

Mr. Custis traced the Ben Barnes Farm back to several different patents. His testimony focused on the chain of title for two of these patents, both of which are relevant

to the issues on appeal: the "Chance" patent, involving 90 acres, and the "Arraroco Neck/Double Purchase" patent (also referred to as "Beverly"), involving 5,800 acres.[14]

The Chance patent, comprising most of the modern-day Ben Barnes Farm, was transferred from the Lord Proprietor to Henry and Anne Smith in 1675. In 1681, the Smiths transferred the property by will to the Whittington family, who eventually transferred it to John King in 1734. Neither Mr. Custis nor the appellees' land records expert, Kirk Simpkins, could account for a 176-year gap in the chain of title for Chance, from 1734 until 1910. Dublin Road, which was established as a public road in 1785, was created during this 176-year gap. In 1910, Benjamin Langford transferred the property to Emma F. Barnes.

The Arraroco Neck patent, originally a 5,800 acre tract, comprises about 23 acres of the southwestern corner of the Ben Barnes Farm. This patent, which includes the section of Old Princess Anne Road claimed by the Andersons, i.e., from the Kings Creek Bridge to the southwestern corner of the Ben Barnes Farm, was conveyed in 1680 from the Lord Proprietor. Portions of this large tract were sold off throughout the years, and it was partitioned in 1849. In 1865, Isaac T. Barnes received multiple partitioned pieces, and in 1894, he conveyed the relevant 23.75 acres to Francis J. Barnes.[15]

---

[14] The original patents are not included in the record on appeal.

[15] These older deeds are not included in the record. The Andersons argue the language of the deed matters because of their interpretation of RP § 2-144(a) ("[A]ny deed, will, or other instrument that grants land binding on any street or highway, or that includes any street or highway as 1 or more of the lines thereof, shall be construed to pass to the

22

In 1913, the pertinent areas were transferred to Benjamin J. Barnes, who sold the parcel to Kings Creek Canning Company in 1952. Kings Creek Canning Company later conveyed some parcels to other individuals, but in 2003, the bulk of the parcel was sold to William and Kevin Anderson. The deed describes the property as "bounded" on the north, east, and south by the adjoining properties and "bounded on the West by the Old Princess Anne Road."

## 2.

## Old Princess Anne Road

The County introduced into evidence a report dated March 2, 2018, prepared by Mr. Simpkins regarding the ownership of the roads. With respect to Old Princess Anne Road, the report states that Somerset County was founded in 1666 and "made provisions for a highway through Somerset County." In 1835, the road was "moved or upgraded" in response to citizen petitions.[16] Mr. Simpkins testified that the procedure involved, from approximately 1785 to 1890, was the "precursor to our present day eminent domain or condemnation," explaining that the land was taken and damages paid based on approval from the Levy Court. He explained that this judicial taking process did not lead to the creation of a deed but was done solely by commissioners approved by the Levy Court. In the late 1700s and early 1800s, there was merely an index for roads.

---

devisee, donee, or grantee all the right, title, and interest of the devisor, donor, or grantor . . . in the street or highway for that portion on which it binds.").

[16] This section of the road is not included in the Andersons' appeal.

In 1927, there were improvements to the road, and it became U.S. Route 13. Mr. Simpkins testified that, with respect to "U.S. 13," the State took possession of the roads by adverse possession or condemnation. He testified that, in 1960, the State transferred ownership of the current Old Princess Anne Road to the County's inventory of public roads.[17] The minutes from a 1960 State Roads Commission meeting provide that the Commission approved the transfer of "18.29 miles of State owned highway to the County for maintenance purposes." Mr. Simpkins testified that this portion of the road included Old Princess Anne Road. Although the experts did not find any deed explicitly transferring ownership of the road from a private party to the County or State, Mr. Simpkins stated that the County has installed and maintained a "fairly substantial drainage system" under the road without objection for years.[18]

### 3.

### Dublin Road

Dublin Road was established as a public road by order of Governor William Smallwood in 1785. The County submitted as an exhibit a copy of the Act by the General

---

[17] The parties agree that U.S. Route 13 was moved to its present location at some point in time.

[18] Mr. Simpkins submitted an affidavit stating:

> The roads contain tiles, culverts and pipes which traverse the subsurface of the roadways between four and six feet in depth in order to create proper drainage between the ditches on either side of the road. These culverts, tiles and pipes have been maintained and upgraded continuously since the roads have been in the possession of the County. At no time have the [Andersons] or their predecessors in title ever contested or objected to the maintenance of the surface and the subsurface portion of the roads herein.

24

Assembly, in response to a petition by the citizens for a road, authorizing commissioners to lay out a new road, which when open would be "deemed, taken and established, to all intents and purposes, as a public road."

Mr. Simpkins testified that there was no public record suggesting that the government would operate the road merely as an easement, and the language stating that it was taken to establish a public road was similar to language in the constitution on condemnation and eminent domain. The Andersons contend that the establishment of the Road, based on the petition of citizens, was an offer of dedication, which resulted in the County acquiring only a right-of-way, not a fee simple interest.

Mr. Simpkins testified that, in 1938, when the State owned and maintained the roads, it decided to widen and straighten Dublin Road, but the project was not started until the late 1940s. Mr. Simpkins' report stated that, in 1947, the State requested that the owners of parcels adjacent to Dublin Road execute deeds and rights-of-way for the widening and straightening of the road. Neither party, however, found any recorded deeds conveying any title to the road to either the State or the County.

William Anderson testified that Dublin Road was paved sometime in the 1950s. Prior to this time, the County installed a large water drainage system under the road, which it has maintained in the intervening years without objection. Kevin Anderson testified that he also had done significant work to maintain the drainage system for Dublin Road and Old Princess Anne Road, at his own expense.

Further facts regarding Dublin Road, as they relate to the Ira Barnes Farm, will be discussed, *infra*.

25

**4.**

**Analysis**

With that factual background in mind, we address the parties' claims regarding fee simple ownership of the roads abutting or bisecting the Ben Barnes Farm. Specifically, the claims involving the collection systems installed under the west-bound lane of Dublin Road and "the southerly 2300 feet of the north bound lane of Old Princess Anne Road."[19] The Andersons assert that Mr. Custis was able to trace the initial patents for the property, with the help of aerial photographs and deeds, to the Andersons' acquisition of the land in 2003. They argue that this evidence established that they are the fee simple owners of the land under the portions of the roads at issue on appeal, subject to the public's right-of-way use/county's right-of-way easement.

With respect to Dublin Road, the Andersons assert that the evidence showed that it

> was and remains a public road laid out on and running over the middle of a
> historically privately-owned, Chance patented land sometime after its 1785
> authorization. But there is no recorded deed or other instrument conveying
> to the County or the State a fee simple or other property interest in the road
> or the land beneath it.

With respect to Old Princess Anne Road, the analysis is different because the road was established before the land was conveyed to private persons. The Andersons assert that the road "was established as a road by the County Commissioners in 1667 as a result of a 1666 proclamation by the Lord Proprietor," when the land was owned by the Lord

---

[19] The Andersons, for various reasons, do not pursue any claims regarding other portions Old Princess Anne Road abutting the Ben Barnes Farm. Accordingly, we will limit our analysis to this portion of the road.

26

Proprietor. There is no record of a deed or anything else conveying title to the road to the County at that time or any time thereafter, and therefore, they argue the government merely dedicated the land for the road to the County.

In support, the Andersons note that, in 1667, the County ordered that "every man shall [mark] out and [clear] his own Land (excepting where bridges are judged needful) for [a] highway by the [direction] of the [s]urveyors." They assert that, after the road was established, fee simple title to the land on which the road was located was conveyed by the Lord Proprietor or the State as part of patent grants, which, according to Mr. Custis, did not exclude from the grant any land occupied by the road. Accordingly, they argue that the patentees acquired fee simple title to the land under Old Princess Anne Road, and Mr. Custis testified that the land records did not "contain a deed from either patentee or any subsequent owner of the patented land conveying to either the proprietary government (before 1776) or to the State or the County (after 1776) fee simple title to the road."

Here, we do not have the original land patents in the record. We note, however, that a common law dedication of property generally conveys to the government and the public only an easement. *See King v. North Chesapeake Beach Land & Imp. Co. Of Calvert Cty.*, 143 Md. 693, 697–98 (1923) ("Common law dedicator 'has full dominion and control over land, subject to an easement in the public[.]'") (quoting 8 R.C.L. 909–10).[20]

---

[20] As this Court explained in *100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 224 Md. App. 13 n.7 (2015), R.C.L., Ruling Case Law, was an American Legal Encyclopedia published from 1854 to 1955.

27

And the general rule regarding the interests involved with respect to a public highway is as follows:

> Subject to qualification under special conditions, the general rule is that in the case of an ordinary highway the public acquires only an easement of passage and its incidents, and the owner of the soil, subject to this servitude, is entitled, except so far as required for highway purposes, "to the earth, timber and grass growing thereon, and to all minerals, quarries and springs below the surface."

*Chesapeake & Potomac Telephone Co. of Baltimore City v. Goldsborough*, 125 Md. 666 (1915) (quoting *Cheasapeake & Potomac Telephone Co. v. Mackenzie*, 74 Md. 36, 47 (1891)).

That the County has maintained the roads for years does not change this conclusion. When a municipality acquires an easement of passage on a public street, it also acquires "the right to grade and improve the surface, and to lay drains, sewers and pipes for various utilities beneath the surface of the land." *Mayor and Council of City of Baltimore v. U.S.*, 147 F.2d 786, 788 (4th Cir. 1945).[21] Based on the general rule that the public acquires only an easement for a public highway, absent evidence to the contrary, the Andersons would own the land under the roads, subject to the County's easement for the road.

Moreover, with respect to the portion of Old Princess Anne Road at issue on appeal, the Andersons assert that the early deeds conveying the land in fee simple described the

---

[21] The rule at common law was different for roads located in rural areas. *See, e.g., Baltimore County Water & Elec. Co. v. Dubreuil*, 105 Md. 424, 427 (1907) ("But the great weight of authority is to the effect that there is a distinction between the use of streets in cities and towns for gas and water pipes and the use of country or rural highways. . . . [In] 'an ordinary road or highway in the country' . . . 'all the public acquires is the easement of passage and its incidents[.]'") (quoting *Chesapeake & Potomac Telephone Co. v. Mackenzie*, 74 Md. 36, 47 (1891)).

28

land as running with the easterly side of the road, and therefore, pursuant to RP § 2-114, the property includes title to the center line of the road. RP § 2-114 provides:

(a) Except as otherwise provided, any deed, will, or other instrument that grants land binding on any street or highway, or that includes any street or highway as 1 or more of the lines thereof, shall be construed to pass to the devisee, donee, or grantee all the right, title, and interest of the devisor, donor, or grantor (hereinafter referred to as the transferor) in the street or highway for that portion on which it binds.

(b) If the transferor owns other land on the opposite side of the street or highway, the deed, will, or other instrument shall be construed to pass the right, title, and interest of the transferor only to the center of that portion of the street or highway upon which the 2 or more tracts coextensively bind.

(c) The provisions of subsections (a) and (b) of this section do not apply if the transferor in express terms in the writing by which the devise, gift, or grant is made, either reserves to the transferor or grants to the transferee all the right, title, and interest to the street or highway.

The deed to the Andersons described the Ben Barnes Farm by reference to Old Princess Anne Road and the adjacent properties, i.e., that the land was "bounded on the West by the Old Princess Anne Road." The Andersons argue that this deed incorporated "all that property conveyed unto Kings Creek Canning Company" by the 1952 deed conveying the property to the Kings Creek Canning Company, which described the land as "binding on the east side of the old state road leading from Princess Anne to Westover."

In *Boucher v. Boyer*, 301 Md. 679, 687 (1984), the Court of Appeals noted that this statute "extends the common law presumption that title to the center of a binding street passes to the grantee." *Accord Barchowsky v. Silver Farms, Inc.*, 105 Md. App. 228, 239 (1995), *cert. denied*, 340 Md. 301 (1995). The purpose of the statute "is to assure landowners that they will have access to streets bounding on their land by granting to them

29

title to the center line of the street while recognizing an easement in the other half of the street." *Boucher*, 301 Md. at 693.

As appellees note, the statute does not apply to a conveyance prior to its passage in 1892. *See Title, Inc. v. Dubel*, 177 Md. 387, 389 (1939). The common law presumption that title to the center of a binding street passes to the grantee, however, still applies. The record here reflects that the land at issue was subject to deeds including the road as the line of the property.

Accordingly, based on the statute and the common law, the Andersons' evidence would establish that they owned in fee simple the land underneath the roads at issue, absent evidence to the contrary. As explained below, appellees failed to submit such evidence.

Appellees argue that they did produce evidence that the County had fee simple ownership of the roadbeds abutting or bisecting the Ben Barnes Farm, and that the circuit court erred in failing to issue a declaratory judgment to that effect. They assert that Mr. Simpkins testified that the County purchased the roads by "a form of eminent domain, in the nature of a condemnation or other judicial taking," and "it was undisputed the roads had passed to County ownership from the State and proprietary governments." Additionally, they assert that the evidence showed that the County maintained the roads and the subsurface for more than 20 years, and therefore, it acquired the roads by adverse possession.

With respect to the argument that the County obtained the property by eminent domain, the Andersons contend that "[t]here is no evidence that the County has acquired

30

by eminent domain fee simple title to any of the land for roads that are the subject of the Andersons' title claims." We agree.

To be sure, Mr. Simpkins testified that a portion of Old Princess Anne Road was moved in 1835, and the process at that time was for land to be taken in a process similar to a condemnation proceeding. Apart from the fact that the portion of the road involved is not at issue in this appeal, there was no evidence to indicate whether the property interest acquired was a fee simple interest or an easement. And with respect to Dublin Road, the County's argument is merely that the action taken "presumably followed the process used . . . to extend Old Princess Anne Road in 1835."

There is authority for the proposition that, where "land is appropriated to the public use under the right of eminent domain," the public authority generally is limited "to their precise needs." Thomas M. Cooley, *Constitutional Limitations* 557 (Spec. ed. 1987). Thus, "[i]n the common highways, the public have a perpetual easement, but the soil is the property of the adjacent owner, and he may make any use of it which does not interfere with the public right of passage, and the public can use it only for the purposes usual with such ways." *Id.* at 558.[22]

Here, Mr. Simpkins' testimony did not provide any basis, beside speculation, for the court to find that this general rule did not apply, and the County instead acquired a fee

---

[22] This rule has been recognized, and applied when appropriate, in several Maryland cases. *See, e.g., Frederick Gas Co. v. Abrams*, 264 Md. 135, 138 (1972); *West v. Maryland Gas Transmission Corp.*, 162 Md. 298, 312–13 (1932); *Baltimore County Water & Elec. Co. v. Dubreuil*, 105 Md. at 427; *Mackenzie*, 74 Md. at 47; *Thomas v. Ford*, 63 Md. 346, 355 (1885).

31

simple interest. Accordingly, the circuit court did not err in determining that the County did not show a fee simple interest in Old Princess Anne Road or Dublin Road based on eminent domain. *See Figgins v. Cochrane*, 174 Md. App. 1, 14 (2007) (Court's determination that a party failed to meet its burden to persuade the court on a question of fact is not clearly erroneous.), *aff'd*, 403 Md. 392 (2008); *Bricker v. Warch*, 152 Md. App. 119, 137 (2003) ("[I]t is almost impossible for a judge to be clearly erroneous when he [or she] is simply **NOT PERSUADED** of something.").

We next address the claim that the County acquired title to the roadbeds by adverse possession. GBS argues that, because the County has owned, operated, and maintained the roads and subsurface of the roads for more than 20 years, it owns the roadbeds in fee simple. The Andersons contend that this contention fails because the County's use of the areas underneath the road to install the drainage system was not hostile, but rather, it was permissive under the implied terms of the easement.

To prove ownership by adverse possession, "a claimant must show continuous possession of the property for 20 years in an actual, open, notorious, exclusive, and hostile manner, under claim of title or ownership." *Porter v. Schaffer*, 126 Md. App. 237, 276, *cert. denied*, 355 Md. 613 (1999). Hostile use is "a possession that is adverse in the sense of it being without license or permission." *Yourik v. Mallonee*, 174 Md. App. 415, 429 (2007) (cleaned up).

Here, we agree with the Andersons that the County's use of the roadbeds was not hostile because the County clearly had an easement, which permitted it to maintain the road by installing the drainage systems and perform other road maintenance. *See Wagner v.*

32

*Doehring*, 315 Md. 97, 104 (1989) ("The grant of a right-of-way does, however, entitle the holder to use the premises at reasonable times and to maintain, improve, or repair the way to serve its purpose."). The circuit court did not err in concluding that the County did not have a fee simple interest in the land under the road based on adverse possession.

Accordingly, based on the evidence presented in this case, we conclude that, with respect to the Ben Barnes Farm, the Andersons showed that they own in fee simple the land under the portion of the roads at issue in this appeal. We turn next to the portion of Dublin Road that bisects the Ira Barnes Farm.

## B.

### Ira Barnes Farm

The Ira Barnes Farm, a 192-acre-parcel depicted on Somerset County Tax Map 0024 as Parcels 0005, 0068, and 0069, is owned solely by William Anderson. Parcel 0005 is separated from Parcels 0068 and 0069 by Dublin Road, with Parcel 0005 to the south of the road and Parcels 0068 and 0069 positioned side by side to the north. The Ira Barnes Farm does not border Old Princess Anne Road, and therefore, only Dublin Road is at issue for this property.

Mr. Custis traced the history of Parcel 0005, the biggest portion of the Ira Barnes Farm, back to the 1785 "Oxhead" patent. He traced the deeds from this initial patent to present day, and he found that the property essentially remained intact from 1785 until 1910, when the initial patent was split into two pieces.

In 1936, the larger of these two pieces, i.e., the modern day Ira Barnes Farm, was acquired by William Anderson's father, Howard Anderson, from Ira Barnes. The chain of

title prepared by Mr. Custis shows that William Anderson's mother, Elsie Anderson, acquired an interest in 1951.

William Anderson gained fee simple title to Parcel 0005 of the Ira Barnes Farm from his parents by inheritance in two parts—the first half interest when his mother died in 1981, and the other half interest when his father died in 1984. Parcels 0068 and 0069, which were part of the Oxhead patent and conveyed by Howard Anderson prior to his death to his daughters (William Anderson's sisters), were later transferred to William Anderson in 1997 and 2005, respectively. Based on these transfers, William Anderson currently has fee simple ownership of the Ira Barnes Farm.

Based on the evidence presented, and the common law rule that, absent evidence to the contrary, the public generally obtains only an easement on a highway, Mr. Anderson would own in fee simple the land under Dublin Road, as was the case for the Ben Barnes Farm. There is a wrinkle, however, with respect to the County's claim in this regard.

As indicated, Mr. Simpkins testified that the State received deeds and rights-of-way from abutting property owners to widen and straighten Dublin Road. Appellees assert that Mr. Simpkins found documents in the State Roads Commission files, which contained a 1947 agreement with the County to widen and pave Dublin Road. That same year, William Anderson's parents, Howard and Elsie Anderson, signed a purchase option agreement for one dollar. The documents included in the record, however, are difficult to read, and the terms of the agreement are unclear.

Mr. Custis stated that he did not know if the agreement gave title, but he believed that the intent of the option was to transfer ownership. One of the documents in the

34

purchase option exhibit contained a line item list with "Howard Anderson" labeled as the property owner and various numbers listed for "cultivated land in fee," "cultivated land easement," "roads in fee," and "roads in easement," for a total of one dollar. No testimony was provided to clarify these line items.

The purchase option exhibit also included a letter, which is very difficult to read. It is dated 1947, from the "Right of Way Engineer," and states: "The conveyance which you signed will be turned over to the County Commissioners for recording." Mr. Custis stated that no deed with respect to this purchase option agreement was filed in the land records. The State Highway Administration records included State road plats containing a handwritten notation, by an unknown author, stating "file . . . indicates options were obtained [and] title taken in name of county." Two versions of the plats, however, were found in the State Highway records, one with this notation and one without. No explanation was given for this circumstance.

Appellees argue that the County gained fee simple ownership of the portion of Dublin Road bisecting the Ira Barnes Farm when William Anderson's parents signed the purchase option agreement with the County in exchange for one dollar. They do not dispute Mr. Anderson's contention, however, that legal title "does not pass, other than by operation of law, until a deed is properly executed and recorded." *Kingsley v. Makay*, 253 Md. 24, 27 (1969).

Appellees assert that the County acquired equitable fee simple title by operation of law when it exercised its purchase option. In response, the Andersons argue that the County did not exercise the option as written because it did not record in the land records

the deed and the plats, which creates uncertainty regarding the equitable property interest to which the County is entitled. They ultimately conclude, however, that,

> given the evidence that Howard and Elsie Anderson (and others) wanted Dublin Road upgraded and had agreed to donate land for that purpose, and that the County proceeded to do it notwithstanding the lack of any recorded deeds and plats, a common law dedication of the upgraded road resulted in which the County acquired **legal title** – but only to an easement.

*See Smith v. Shiebeck*, 180 Md. 412, 418 (1942) ("In Maryland no particular form or ceremony is necessary to dedicate land to public use. No deed is necessary to evidence a dedication, nor any grantee in esse to take the title."); *King*, 143 Md. at 697–98 (Common law dedication of property conveys to the government and the public only an easement.).

Given the lack of evidence establishing the nature of the interest conveyed by the purchase option, i.e., fee simple interest or an easement, we cannot conclude that the circuit court was clearly erroneous in concluding that the County did not meet its burden of showing that the purchase option agreement conveyed fee simple interest in the land under Dublin Road. *See Figgins*, 174 Md. App. at 14 (Court's determination that a party failed to meet its burden to persuade the court on a question of fact was not clearly erroneous.), *aff'd* 403 Md. 392 (2008). *Bricker*, 152 Md. App. at 137 ("[I]t is almost impossible for a judge to be clearly erroneous when he [or she] is simply **NOT PERSUADED** of something.").

## C.

### Remand

Based on the analysis set forth above, we conclude that the circuit court erred in finding that the Andersons did not own in fee simple the land under the roads at issue in

36

this appeal. Accordingly, we shall reverse that portion of the opinion and remand to the circuit court to issue a declaratory judgment that the Andersons are the fee simple owners of the roads.

## II.

### "Sufficient Interest"

The Andersons also sought a declaration that GBS, by burying its electric cables beneath the roads without consent, trespassed on the Andersons' property. The circuit court did not issue such a declaration, instead concluding that, although the County failed to show that it owns the land under the roads in fee simple, GBS nevertheless had the legal right to install the collection systems because the County had a "sufficient interest" in the roads to validly grant that right to GBS. The court did not explain the basis for this ruling or specify the nature of the County's interest. *See* Md. Rule 2-522 (In a contested court trial, the judge shall provide "a brief statement of the reasons for the decision.").

The Andersons argue on appeal that the court's ruling in this regard was erroneous. They assert that the only property interest in the roads that would be sufficient to entitle the County to grant GBS an easement "to place industrial-scale, electrical cables beneath the roadbeds is a fee simple interest," which GBS and the County failed to establish. They contend that the evidence established a dedication of the roads to the County, but only that "of an implied, right-of-way or easement interest." They argue that this right entitles the County to use of the roads only for the purpose for which the easement was obtained, i.e., as a public way of transportation, and it does not allow the County to use the ground below,

37

or allow a third party to use the land, for other purposes without the permission of the landowner.

GBS and the County contend that the trial court correctly concluded that the County had a sufficient interest to grant GBS the right to install cables under the roads. Initially, the County argues that the court's sufficient interest finding was based on a finding that it owned the roads in fee by adverse possession based on its maintenance of the roads for more than 20 years. This assertion is inconsistent with the trial court's finding that the County did not prove ownership of the roads in fee simple. In any event, as we have explained, the circuit court did not err in finding that the County did not establish fee simple ownership of the land beneath the roads based on adverse possession.

The County next contends that, even if the County only has a public right-of-way easement with respect to the roads, case law indicates that uses permitted within an easement or right-of-way can evolve over time. It asserts:

> If Somerset County roads, established in 1666 and 1795, are easements or rights of way, it is reasonable to anticipate that those rights of way 'would conform over time to the reasonable demands of the public' by permitting installation of electric transmission or collection lines in the beds of those public roads to serve the public.

It argues that, where the County "has maintained pipes under the roads to conduct stormwater," and it could have installed its own cables to conduct electrical current, it had a sufficient interest to allow GBS to do what it could do itself.

If the County had a fee simple interest in the land under the roads permitting it to install cables to transmit solar power, we would agree that the County could grant GBS an easement to do the same. *See West v. Maryland Gas Transmission Corp.*, 162 Md. 298,

38

316 (1932) (holders in fee simple of bed of the road have the right to lay pipes, subject to the grant of an easement, and may convey this right to another). Here, however, the County failed to prove this, and as indicated, in the absence of evidence to the contrary, the general rule is that the public has only an easement interest in a highway.

The rights of someone with an easement interest are different and more nuanced. As this Court has explained:

> An easement is broadly defined as a nonpossessory interest in the real property of another. An easement involves primarily the privilege of doing a certain class of act on, or to the detriment, of another's land, or a right against another that he refrain from doing a certain class of act on or in connection with his own land.
>
> An easement may be created by express grant, by reservation in a conveyance of land, or by implication.

*USA Cartage Leasing, LLC v. Baer*, 202 Md. App. 138, 174–75 (2011) (cleaned up), *aff'd*, 429 Md. 199 (2012)). "Easements by implication may arise 'by prescription, necessity, the filing of plats, estoppel, and implied grant or reservation where a quasi-easement has existed while the two tracts are one.'" *Lindsay v. Annapolis Roads Property Owners Ass'n*, 431 Md. 274, 291 (2013) (quoting *Boucher*, 301 Md. at 688).[23]  In general, "the terms 'right-of-way' and 'easement' are synonymous." *Chevy Chase Land Co. v. United* States, 355 Md. 110, 126 (1999).

---

[23] Maryland's Public Utility Article also contains provisions providing for easements for telecommunication companies. Md. Code (2010) § 8–103(a) of the Public Utilities Article ("PU") (A telephone company may construct lines "along and on a road, street, or highway[.]"); PU § 8–106(a) (To obtain an easement, telephone company can apply to circuit court to obtain appraisal of damages to be paid to property owners).

39

An easement holder generally "cannot use the land for any purpose other than that contemplated by the grant." *Wagner*, 315 Md. at 104. A use that is not within the scope of the original terms or intent of the easement creates an additional servitude and entitles the landowner to compensation. *Peck v. Baltimore County*, 286 Md. 368, 379 (1979). Whether an additional servitude has occurred, however, is a question of fact for the circuit court to decide. *Id.*

When there is an express grant, the court will look to the terms of the grant. *See Chevy Chase Land Co.*, 355 Md. at 143 (a recreational trail for bikers and hikers was within scope of a right-of-way easement originally established for a railroad because this use was consistent as a means of transit and the deed establishing the right-of-way contained no limiting language). An implied easement is "based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances," and this intention is a factual question. *Purnell v. Beard & Bone, LLC,* 203 Md. App. 495, 508 (2012) (quoting *Boucher*, 301 Md. at 688).

Here, as indicated, the circuit court did not explain the basis for its conclusion that the County had a "sufficient interest" in the roadbeds to grant GBS the right to install the collection systems. Assuming that the circuit court found that the County had an easement, it did not state the type of easement on which it was basing its conclusion or whether the use involved was within the scope of the original easement. The court's sparse discussion does not permit this Court to make a determination whether any factual findings in this regard were clearly erroneous.

40

Appellees contend, citing *Wagner*, 315 Md. at 104, that the grant of a right-of-way generally entitles "the holder to use the premises at reasonable times and to maintain, improve, or repair the way to serve its purpose." They assert that this scope accounts for evolving uses consistent with the easement's original purpose. *See Chevy Chase Land Co.*, 355 Md. at 145.

With respect to the appropriate scope of a public highway easement, "the purpose of a highway easement is for 'passing and repassing' and only when a use is 'not incident to such right of passage' does it create an additional servitude." *Chevy Chase Land Co.*, 355 Md. at 145 (quoting *Poole v. Falls Road Electric Ry. Co.*, 88 Md. 533, 537 (1898)). Rights incidental to a public highway easement include the "right to use the public highways for all purposes of travel, including the conveyance of persons, the transfer of goods and transmission of intelligence[.]" *West*, 162 Md. at 311–12 (quoting *Crullen v. Edison Elec. Illumination Co. of Boston*, 254 Mass. 93, 94–95 (1925)).

The Court of Appeals has recognized, however, a "distinction between the use of the streets in cities and towns for gas and water and the use of country or rural highways." *Frederick Gas Co. v. Abrams*, 264 Md. 135, 138 (1972). *Accord Peck*, 286 Md. at 380–81; *West*, 162 Md. at 312–13. In *Abrams*, the Court stated that, in suburban and urban areas, "the right-of-way for a public highway extends not only horizontally over the surface of the land for the purpose of travel but also vertically below the surface of the roadbed" to lay utility lines. 264 Md. at 140 (quoting *Green v. Washington Suburban Sanitary Commission*, 259 Md. 206, 219 (1970)). The rationale is that, because utilities providing modern comforts are central to life in more urban areas, those purchasing property there

41

are presumed to have consented "that such uses could be made of a street laid out over land[.]" *Id.* at 138 (quoting *Baltimore County Water & Electric Co. v. Dubreuil*, 105 Md. 424, 440 (1907)).

In contrast, the Court of Appeals has viewed rural areas as lacking the same expectations for things such as utility lines. *Id.* at 140, 146. For this reason, a right-of-way easement in a rural area does not extend to the roadbed, i.e., the use of the roadbeds is not within the scope of the highway easement. *Id.* at 139–40.[24] Here, the court did not make a factual finding regarding the character of the area at issue in this case.

In sum, because the circuit court's order does not state the basis for its finding that the County had a "sufficient interest" to grant GBS the right to install the collections systems in the roads, and because factual findings are required to resolve this issue, we remand to the circuit court for clarification regarding this issue.[25]

---

[24] Appellees argue that the precedent in *Frederick Gas Co. v. Abrams*, 264 Md. 135 (1972), is outdated and should not be followed. In that case, the Court of Appeals credited the utility's argument that the qualities of rural communities justifying this distinction had shifted since the rule was established by the Court in *Dubreuil* in 1907. *Id.* at 146–47. The Court, however, was reluctant to eliminate the distinction between rural and urban communities absent action from the legislature. *Id.* Because neither the General Assembly nor the Court of Appeals have taken such action since *Abrams*, we are bound by previous case law to apply this distinction.

[25] We also note that, in *Abrams*, the Court stated that "[w]hether the utility installed in the public way is within the original scope of the easement" depends on a "factual determination of whether it is for the benefit of the immediate surrounding community." 264 Md. at 145 (quoting 2 *American Law of Property*, § 9.51 (1952 ed.)) "Where the construction is for the benefit of a distant community, such as a natural gas pipeline or water main, it has generally been held that such use imposes an additional servitude[.]" *Id.* Given this case law, even if the circuit court finds the area to be urban or suburban, it may want to consider whether the solar energy transported by the collection systems was for the

## III.

### Delay in filing suit

In GBS's counterclaim for a declaratory judgment, GBS asserted that the Andersons strategically delayed asserting their claims, and therefore, it requested a declaration that they had "waived and/or are barred by the doctrines of estoppel and/or laches from asserting any right they hold to require Great Bay to remove installed collector lines in Dublin Road and Old Princess Anne Road." It sought a declaration that the Andersons were "precluded from the equitable relief they seek based on the doctrines of waiver, estoppel and laches." The circuit court issued such an order, stating that the Andersons "are barred from any equitable relief they seek based on the doctrines of waiver, estoppel, and laches."

The Andersons contend that the court erred in so ruling. They assert that the court did not explain the basis for its findings, the evidence does not support the findings, and the court's factual findings were clearly erroneous.

GBS and the County contend that the court correctly found that all three defenses barred relief. GBS asserts that the Andersons believed years before they filed suit that they held legal rights to block installation of the cables, but they did nothing to enforce those rights. It points specifically to the March 3, 2016, Planning Commission meeting, where Kevin Anderson voted to approve the site plan for the project. The County contends that the Andersons should have brought suit after receiving notice in March 2017 that the cable

---

benefit of a distant community, given David Philpott's testimony that GBS had entered into a contract to sell the power to the United States government.

installation would begin, but they "sat back and watched while cable was installed," filing suit only after "cable installation was virtually complete," after GBS "had committed itself irretrievably."

As the Andersons note, the circuit court did not elaborate on the basis of its conclusion that they were barred from equitable relief based on the doctrines of waiver, estoppel, and laches. The court merely stated that this conclusion was based on the following factual findings:

4.     Somerset County has maintained Dublin Road and Old Princess Anne Road for decades. In addition to maintaining the surface of the roads, the County has maintained the subsurface of said roads, including the maintenance of drainage pipes and culverts underneath the roadbeds. These pipes and culverts benefit the farms that Plaintiffs own.

5.     In March and April of 2015, Plaintiffs negotiated with Great Bay to lay cable under Plaintiffs' farms, the negotiations failed and, on or about 29 June 2015, Great Bay entered into an Easement Agreement with Somerset County to lay cables under certain County roads.

6.   In January 2016, Plaintiffs began surveying Old Princess Anne Road.

7.     In February 2016, Plaintiffs learned the County and Great Bay had entered into an Easement Agreement to install the cables under County roads.

8.   On 3 March 2016, Plaintiff Kevin Anderson participated in a Planning and Zoning Commission meeting in which cable installation under Old Princess Anne Road, Dublin Road, and Arden Station Road was discussed; **he also voted to approve the proposed cable installation**.

9.   In late 2016, both Plaintiffs informed County Commissioners Charles Fisher and Rex Simpkins that they objected to cable installation under Old Princess Anne Road, Dublin Road, and Arden Station Road, on the theory that they actually own the roads; Mr. Fisher and Mr. Simpkins responded that the County owns the roads, and Mr. Simpkins said, "If you disagree, that's why we have a courthouse."

44

10.   On or about 29 March 2017, Plaintiffs received a form letter from the County informing them that portions of Old Princess Anne Road, Dublin Road, and Arden Station Road would soon be closed to accommodate cable installation; and, at about the same time, Plaintiffs saw a notice to that effect in a local paper.

11.   On or about 5 April 2017, Plaintiffs again saw a notice in the local paper warning that the three roads which are the subject of this suit would soon be closed to accommodate cable installation.

12.   Shortly thereafter, cable installation began on Old Princess Anne Road, and was completed by early May, when cable installation began on Dublin Road.

13. On or about 16 May 2017, Plaintiff Kevin Anderson entered a trailer serving as a field headquarters for Great Bay work crews installing the cable, informed the workers that he and his father were asserting ownership to Dublin Road, and asked for contact information so he or his attorney could write Great Bay demanding installation stop.

14. On 17 May 2017, Mr. Smethurst wrote on behalf of Plaintiffs to Great Bay, asserting that Plaintiffs own Old Princess Anne Road and Dublin Road, or portions of them, and demanding installation stop.

(Emphasis added.)

We begin by addressing the Andersons' contention that Paragraph 8 of the court's opinion contains incorrect fact findings. This Court will not disturb a factual finding made by the circuit court at a bench trial unless it is clearly erroneous, and we "will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). "If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Solomon v. Solomon*, 383 Md. 176, 202 (2004) (quoting *Fuge v. Fuge*, 146 Md. App. 142, 180 (2002)).

We agree with the Andersons that the trial court's factual finding, that Kevin Anderson voted at the March 3, 2016, meeting of the Planning Commission "to approve

45

the proposed cable installation," was clearly erroneous. The minutes from the March 3, 2016, meeting, and the testimony by Kevin Anderson and Mr. Pusey, make clear that the vote taken that day was not on the cable installation, but instead, it was on the site and substation locations. And Kevin Anderson gave uncontradicted testimony that the Planning Commission was not involved with approval of cable installation under the roads.[26] Therefore, this was a clearly erroneous factual finding by the circuit court.

We next consider the effect that this erroneous finding of fact had on the circuit court's ultimate conclusion regarding waiver, estoppel, and laches. We will address each defense, in turn.

## A.

## Waiver

Waiver is the "intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Creveling v. Gov't Employees Ins. Co*., 376 Md. 72, 96 (2003) (quoting *Food Fair v. Blumberg*, 234 Md. 521, 531 (1964)). Waiver, therefore, hinges on the intent of the party and requires an unequivocal demonstration that waiver was intended. *Taylor v. Mandel*, 402 Md. 109, 135–36 (2007). *Accord Kiley v. First Nat'l Bank of Maryland*, 102 Md. App. 317, 338 (1994) (waiver argument rejected where no clear intention to relinquish forever a right), *cert. denied*, 338 Md. 116 (1995).

---

[26] At oral argument, appellees agreed that the March vote by the Planning Commission was not to approve the cable installation in the roads, although they argued that this was the practical effect of the vote.

Whether a party has waived its right to assert a claim is a question of fact, which this Court will not disturb unless clearly erroneous. *Hoskins v. Warden of Md. House of Correction*, 235 Md. 613, 615 (1964) ("[T]he sufficiency of the waiver is a question of fact.").

Here, although the court did not specify the basis of its waiver finding, the factual findings referred to by appellees involve: (1) Kevin Anderson's March 3, 2016, vote as a member of the Planning Commission; and (2) the notice given to the Andersons on March 29 and April 5, 2017, that the roads would be closed for cable installation.[27] With respect to the first factual finding, we have already stated that this was clearly erroneous, and therefore, it would not support a finding of waiver. With respect to the notices received in the spring of 2017, there was a delay of approximately three months after receiving these notices before the Andersons filed suit. This delay does not, by itself, support a finding of an intentional relinquishment of the right to contest the installation of the cables.[28] Accordingly, the circuit court's finding that the Andersons' claim for injunctive relief was barred based on waiver was clearly erroneous.

---

[27] We note that, although Kevin Anderson stated that he knew the project was a possibility before this, he was told in 2016 that the project was not going to move forward, so he should not worry about it. He testified that it was not until the notices in the spring of 2017 that he knew that the project actually would proceed.

[28] GBS asserts on appeal that the Andersons intentionally delayed their filing until construction was nearly complete in retaliation for their inability to close the initial easement deal for compensation back in 2014 and to force GBS back to the table for payment. Even if there was evidence of such an intent, and the court made a factual finding to that effect, which it did not, it is not clear that this would satisfy the requirements necessary to find a waiver.

## B.

## Estoppel

"[E]stoppel rests upon a detrimental change of position induced by the acts or conduct of the party estopped." *Gould v. Transamerican Assocs.*, 224 Md. 285, 295 (1961). This Court has described estoppel as follows:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Olde Severna Park Improvement Ass'n, Inc. v. Barry*, 188 Md. App. 582, 595 (2009) (quoting *Knill v. Knill*, 306 Md. 527, 534 (1986)), *cert. denied*, 412 Md. 496 (2010).

The doctrine of estoppel applies where there is (1) voluntary conduct or representation; (2) reliance; and (3) detriment. *Id.* The Court of Appeals explained in *Knill* that these elements are inherently interrelated. 306 Md. at 535. "The voluntary conduct or representation of the party to be estopped must give rise to the estopping party's reliance and, in turn, result in detriment to the estopping party." *Id.* Although wrongful conduct is often found where estoppel is present, the Court of Appeals has held that "estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." *Id.* at 534.

"The party asserting estoppel 'bears the burden of proving the facts that create it.'" *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710, 732 (2009) (quoting *Creveling*, 376 Md. at 102). Whether estoppel applies to bar a claim "is a question

48

of fact to be determined in each case," and therefore, we will not disturb the circuit court's judgment unless it was clearly erroneous. *Barry*, 188 Md. App. at 595. *Accord Heartwood 88, Inc. v. Montgomery County*, 156 Md. App. 333, 370 (2004) ("[T]he question of estoppel is a question of fact because it involves 'the assessment of conduct by one party and reliance by another.'") (quoting *Allstate Ins. Co. v. Reliance Ins. Co*., 141 Md. App. 506, 515 (2002)).

Here, to the extent that the circuit court's conclusion regarding estoppel was based on its erroneous fact finding that Kevin Anderson voted to approve the cable installation, this conclusion was clearly erroneous. And to the extent it was based on the Andersons' delay in filing suit after they received the notices in the spring of 2017 that the installation was going to happen, the record does not reflect, and the circuit court did not find, that GBS changed its position on the project, i.e., decided to go forward with the installation because the Andersons did not file suit as soon as they received the notices. *See Savonis v. Burke*, 241 Md. 316, 319 (1966) ("It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit . . . changed his position for the worse, having believed and relied on the representations of the party sought to be estopped."); *Lusby v. First Nat'l Bank of Md.*, 263 Md. 492, 506 (1971) (Lusby was not entitled to invoke doctrine of equitable estoppel where there was no evidence that she had "changed her position for the worse because of her reliance on the representation."); *Old Republic Ins. Co. v. Gordon*, 228 Md. App. 1, 12 (2016) (Where party did not allege that her position changed based on other party's actions, equitable estoppel was inapplicable). Indeed, David Philpott testified that GBS proceeded with the installation, despite receiving a letter

49

from the Andersons' attorney, because they had to maintain their construction schedule or be subject to substantial penalties.

Accordingly, the circuit court's finding that estoppel barred the Andersons' request for injunctive relief, based on the factual findings set forth in its opinion, was clearly erroneous.

## C.

### Laches

Laches precludes equitable relief when "a plaintiff has exhibited negligence or lack of due diligence in asserting a right to the detriment of the defendant." *Jahnigen v. Smith*, 143 Md. App. 547, 555, *cert denied*, 369 Md. 660 (2002). Laches "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 586 (2014) (quoting *Liddy v. Lamone*, 398 Md. 233, 244 (2007)). *Accord Murray v. Midland Funding, LLC*, 233 Md. App. 254, 260 (2017) (In assessing a claim for laches, a judge "considers plaintiff's delay in asserting the claim and its causes and weighs that against the prejudice to the defendant caused by the late assertion of the equitable claim."). Whether prejudice to the defendant has been established is dependent "upon the facts and circumstances of each case, but it is generally held to be anything that places [an opposing party] in a less favorable position." *Ademiluyi v. Egbuonu*, 466 Md. 80, 124 (2019) (quoting *Parker v. Bd. of Election Sup'rs*, 230 Md. 126, 130 (1962)).

In contrast to estoppel and waiver, the question of whether laches has been established is a mixed question of fact and law. *Liddy*, 398 Md. at 245. Whether the

50

elements of laches have been established is a question of fact to be reviewed under a clearly erroneous standard, but whether, "in view of the established facts, laches should be invoked, is a question of law." *Id.* at 246. "Accordingly, where the issue is whether a party is precluded by laches from challenging an action of another party, we shall review the trial court's ultimate determination of the issue *de novo*." *Id.* at 248–49.

Here, GBS argues that the Andersons are barred by the doctrine of laches from asserting any right to require it to remove the installed collector lines. It can hardly be disputed that the delay in filing suit until after the cables were almost completely installed put GBS in a detrimental position. Mr. Philpott testified that it cost ten million dollars to install the collection systems, and it would cost an additional two million dollars to remove the cables at this point. Thus, the prejudice component of a laches defense has been satisfied.

The more difficult question is the reasonableness of the Andersons' delay in filing suit. In that regard, we must ascertain the length of the delay, and then decide whether that delay was unreasonable. *Jones v. State*, 445 Md. 324, 343–44 (2015). *Accord State Center, LLC*, 438 Md. at 590 (To assess whether the delay is unreasonable, "we must analyze (i) when, if ever, the claim became ripe (*i.e.*, the earliest time at which [the Andersons] were able to bring their claims); and (ii) whether the passage of time between then and when [the Andersons] filed the complaint was unreasonable.").

Here, as indicated, it is unclear from the circuit court's opinion when the court considered the clock to started running on laches. In order for a claim to ripen, however, "a justiciable controversy must exist." *State Center, LLC*, 438 Md. at 590. "Generally, an

51

action for declaratory relief lacks ripeness if it involves a request that the court 'declare the rights of parties upon a state of facts which has not yet arisen, [or] upon a matter which is future, contingent and uncertain.'" *Id.* at 591 (quoting *Boyds Civics Ass'n v. Montgomery Cty. Counsel*, 309 Md. 683, 690 (1987)). Based on Kevin Anderson's testimony that he was told in 2016 that the project was not going forward, we conclude that there was no evidence that a claim was ripe at that point. Accordingly, we will confine our analysis to the time beginning on March 29, 2017, when the Andersons received notice that the project was going forward and installation of the cables in the roads was going to begin soon.

In assessing the reasonableness of the delay, therefore, we are looking at the delay between March 29, 2017, and the filing of the complaint on July 5, 2017, a gap of approximately three months. Although this is a short time period, "laches is not merely a question of time, but principally the question of the inequity in permitting the claim to be enforced." *Waller v. Golden*, 706 S.E.2d 403, 406 (Ga. 2011) (quoting *Hall v. Trubey*, 498 S.E.2d 258, 261 (Ga. 1998)). Thus, even a relatively short period of time may be found to constitute an unreasonable delay resulting in laches under the circumstances of the case.

In *Parker v. Board of Election Supervisors*, 230 Md. 126, 128 (1962), Parker filed a complaint on September 25, 1962, alleging that "nominating petitions filed with the Board of Supervisors of Elections were defective due to [among other things] the lack of a sufficient number of legitimate signatures." The Court of Appeals noted that Parker had knowledge of the petitions when they were published on May 30, 1962, and his delay of approximately four months before filing suit was unreasonable and unjustified given the prejudice to appellees. *Id.* at 131–32. Similarly, in *Liddy v. Lamone*, 398 Md. at 236–38,

253, the Court held that a claim asserting that a political candidate was ineligible to hold office was barred by laches because the lawsuit was filed four months after the candidate filed his certificate of candidacy, one month after the candidate won the primary election, and 18 days before the general election, and the unreasonable delay prejudiced the State Board of Elections, which had insufficient time to change voting machines and reprint ballots. Thus, the approximately three-month delay here, although not a lengthy delay, could be deemed unreasonable, depending on the circumstances.

In assessing whether the delay here was unreasonable, we look to analogous decisions in other jurisdictions, where suit was filed after construction was in progress. In *Waller*, 706 S.E.2d at 404, the Goldens received approval from their Homeowner's Association to build a swimming pool in their yard. When construction began on the pool on August 11, the neighbors complained. *Id.* at 405. The Association held a hearing on August 21, and although the pool did not comply with the community's restrictions, it allowed construction to continue. *Id.* The Wallers sent a letter demanding that construction stop on August 31, and they filed a lawsuit on September 3, when the pool was nearly halfway complete, and the Goldens already had invested over $20,000 in the project. *Id.* at 405, 407. The Supreme Court of Georgia held that the Wallers' claims were barred by laches because, even though the plaintiffs had previously lodged verbal objections, they waited 24 days after receiving notice of the construction to file suit, and therefore, they failed to act diligently to assert their interests. *Id.* at 407. *Accord Osage Nation v. Bd. of Comm'rs of Osage Cty.*, 394 P.3d 1224, 1237 (Okla. 2017) ("Laches requires reasonable conduct on the part of a plaintiff in taking legal efforts to stop or prevent alleged wrongful

53

construction prior to an injury arising from economic damage occasioned by the project, thus minimizing economic damage flowing from alleged wrongful construction."); *Carson City v. Price*, 934 P.2d 1042, 1043–44 (Nev. 1997) (Laches barred request to tear down affordable housing units because plaintiffs waited eight months to file and costly construction was already underway.); *Bailey v. Chernoff*, 45 A.D.3d 1113, 1115 (N.Y. 2007) (Laches barred request for injunctive relief to remove boathouse because development homeowners were on notice of the intent to build the boathouse following an open meeting in July 2004, and once construction began in May 2005, they "did not seek a preliminary injunction and, instead, waited until after construction was completed" to file suit in November 2005.).

This reasoning is helpful in determining whether the Andersons' delay was unreasonable given all the circumstances. We agree with these cases that, when a party knows that construction is scheduled to occur, they must diligently protect their rights, and waiting until the defendant incurs significant construction costs before filing suit may result in the claim being barred by laches.

Here, the Andersons were on notice that the installation of the cables under the roads was a possibility more than a year prior to the filing of their complaint. They were on notice on March 29, 2017, that the collection systems *were* going to be installed under the roadbeds, and they watched construction begin on the roads adjacent to their property, starting in April 2017. Despite this, they waited to file suit until July 5, 2017, when the multi-million-dollar project was 90–95% completed. Under these circumstances, the

circuit court was not clearly erroneous in concluding that the Andersons' delay in filing suit was unreasonable.

Given the Andersons' unreasonable delay and the prejudice to GBS, the circuit court did not err in concluding that the Andersons' equitable claims were barred by laches. Accordingly, it properly denied the Andersons' request that the court order GBS to remove the cables and restore the roads to their previous condition.[29]

## IV.

### Conclusion

In sum, we conclude that circuit court erred in finding that the Andersons did not own in fee simple the land under the roads at issue in this appeal. Accordingly, we shall remand to the circuit court to issue a declaratory judgment that the Andersons are the fee simple owners of Dublin Road running from Old Princess Anne Road easterly through the Ben Barnes Farm (Parcel 0004) and the Ira Barnes Farm (Parcels 0005, 0068, 0069) to its intersection with Arden Station Road, except for the portion of the road lying directly in front of Parcels 0076 and 0079, and the easterly half of Old Princess Anne Road extending from the new Kings Creek bridge southerly approximately 2,400 feet to the southwest corner of the Ben Barnes Farm (Parcel 0004).

With respect to the circuit court's conclusion that the County had "sufficient interest" in the roads to give GBS the "legal right to install the collection systems," we

---

[29] A request for a declaratory judgment generally is not subject to the defense of laches. *See Murray v. Midland Funding, LLC,* 233 Md. App. 254, 261 (2017). Accordingly, our holding that the Andersons own the roadbeds in fee simple is not altered by this laches analysis.

remand to the circuit court, without reversal or affirmance, to make further findings on this issue, consistent with this opinion. If the court finds that GBS did not have the right to install the collection systems pursuant to the Easement granted by the County, it shall determine what remedy, if any, is available to the Andersons. With respect to the equitable relief of an injunction to require GBS to remove the cables, however, we affirm the circuit court's finding that this claim is barred by laches.

**JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED, IN PART, REVERSED, IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANTS AND 50% BY APPELLEES.**